J-S37042-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: S.L.J., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: S.J., SR., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1542 EDA 2025 |

Appeal from the Decree Entered May 30, 2025
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000432-2024

BEFORE: DUBOW, J., KUNSELMAN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:        **FILED NOVEMBER 12, 2025**

S.R. ("Father") appeals from the decree entered in the Court of Common Pleas of Philadelphia County Juvenile Division, which involuntarily terminated his parental rights to his minor child, S.L.J. ("Child") (born in August of 2022), pursuant to Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938.[1]

_____

[*] Former Justice specially assigned to the Superior Court.

[1] The juvenile court also involuntarily terminated the parental rights of biological Mother as to Child. Mother filed appeals from the juvenile court's decree changing Child's placement to adoption, as well as from the decree involuntarily terminating her parental rights to Child. Mother's appeals, docketed at 1638 EDA 2025 and 1639 EDA 2025, respectively, have been consolidated *sua sponte* by this Court. We address Mother's appeals in a separate decision.

Father's appointed counsel, Emily Cherniack, Esquire, has filed an **Anders**[2] brief, along with a petition seeking to withdraw from representing Father on appeal. After our careful review, we affirm the juvenile court's decree and grant counsel's petition to withdraw.

The relevant facts and procedural history are as follows: On December 19, 2022, the Philadelphia Department of Human Services ("DHS") filed a dependency petition as to Child. Therein, DHS alleged that, in August of 2022, DHS received a General Protective Services ("GPS") report indicating Mother gave birth to Child at Thomas Jefferson University Hospital, and Child was then transported to Children's Hospital of Philadelphia ("CHOP") for treatment of a hernia. The GPS report further alleged that, at the time of Child's birth, Mother tested positive for marijuana, benzodiazepines, and phencyclidine ("PCP"). Mother disclosed that she used Xanax, which she purchased on the street, to self-medicate for mental health issues. Mother was not receiving any mental health services. This report was found to be valid.

DHS further alleged that it went to CHOP and discovered Child was in the neonatal intensive care unit ("NICU"), and Mother was discharged from the hospital. On August 31, 2022, DHS went to maternal grandmother's home

_____

[2] **See Anders v. California**, 386 U.S. 738 (1967), and **Commonwealth v. Santiago**, 602 Pa. 159, 978 A.2d 349 (2009). The **Anders** principles and process have been extended to appeals involving the termination of parental rights. **See In re V.E.**, 611 A.2d 1267 (Pa.Super. 1992) (extending **Anders** briefing requirements to termination of parental rights appeals involving indigent parents represented by court-appointed counsel).

where Mother was residing. Mother admitted she had relapsed into drug use, but she wanted to complete whatever was required of her to keep custody of Child. Accordingly, DHS implemented a safety plan whereby maternal grandmother would ensure Child's needs were met while in the care of Mother. Child was subsequently discharged into the care of Mother.

DHS averred that, on September 7, 2022, In-Home Services ("IHS") were implemented through the Community Umbrella Agency ("CUA)"- Northeast Treatment Centers, which began weekly visits at the home of maternal grandmother. Specifically, on September 12, 2022, CUA visited maternal grandmother's home, and Mother admitted she had not yet engaged in substance abuse or mental health treatment. CUA advised Mother that it was necessary for her to receive treatment, and, thus, CUA implemented another safety plan in which maternal grandmother would ensure Child's needs were met while in the care of Mother.

On September 22, 2022, CUA visited maternal grandmother's home. Mother and Father were both present. CUA informed Mother and Father that they would be referred to a dual diagnosis treatment plan, and CUA noted that Father appeared to be under the influence of an unknown substance during the visit. Father advised that, in the past, he had attempted to get treatment through the John F. Kennedy Behavioral Health Center; however, he had been unsuccessful in scheduling treatment sessions.

DHS alleged that, on September 30, 2022, CUA visited maternal grandmother's home and advised Mother that intake appointments for substance abuse treatment had been scheduled for Father and Mother. Specifically, Father's appointment was scheduled for October 4, 2022, while Mother's appointment was scheduled for October 6, 2022. On October 4, 2022, CUA spoke to Mother on the telephone and noted that Mother's speech was slurred. Mother reported she was at paternal grandmother's home with Father. CUA subsequently learned that Mother did not attend her substance abuse treatment intake appointment on October 6, 2022. CUA scheduled an intake appointment for Mother at CHANCES, and Mother was to attend on October 19, 2022.

DHS averred that, on November 8, 2022, CHANCES contacted CUA to advise that, aside from the intake appointment on October 19, 2022, Mother had not attended any substance abuse treatment appointments. On November 21, 2022, CUA went to maternal grandmother's home, and Mother stated she had been attending substance abuse treatment appointments at CHANCES. Maternal grandmother informed CUA that she was evicting Mother from her home in three weeks, and she would be unable to care for Child if Child was removed from Mother's care. On November 21, 2022, CUA contacted CHANCES and discovered Mother had been discharged from the program because she did not attend any appointments beyond the initial October 19, 2022, intake appointment.

DHS alleged that, on December 6, 2022, CUA went to maternal grandmother's home for a scheduled safety visit; however, no one answered the door. CUA contacted Mother by telephone that same date, and Mother refused to disclose her whereabouts to CUA. However, she agreed to meet with CUA at 12:00 p.m. at maternal grandmother's home. Accordingly, CUA returned to the home, and Mother advised she had enrolled in a virtual substance abuse program; however, she was unable to provide any information about the virtual program. Mother informed CUA that she planned to obtain new housing after she and Child were evicted from maternal grandmother's home.

At this point, CUA had no proof that Mother, who has a history of substance abuse, was receiving substance abuse treatment. Notably, prior to Child's birth, on July 1, 2020, Mother was arrested and charged with possession with the intent to deliver a controlled substance, and after she failed to appear for a hearing, the court issued a bench warrant for her arrest.

DHS alleged that Father, who also has a history of substance abuse, reported to CUA that he was receiving substance abuse treatment; however, he would provide no information with regard thereto. Father suffers from depression, anxiety, and attention deficit hyperactivity disorder ("ADHD"); however, it was unknown to CUA whether he received mental health treatment. Father was residing with paternal grandmother; however, she

informed DHS that she was evicting Father. Accordingly, DHS requested the juvenile court find Child to be a dependent child.

Following a hearing, by order entered on January 6, 2023, the juvenile court gave temporary physical custody of Child to Father pending the dependency hearing. On February 10, 2023, following a hearing, the juvenile court found Child to be a dependent child and directed that Child be removed from Mother's care. The juvenile court continued temporary physical custody of Child with Father in paternal grandmother's home. The juvenile court directed that Mother and Father receive drug and alcohol treatment, as well as submit to random drug testing.

On May 9, 2023, following a permanency review hearing, the juvenile court retained temporary physical custody of Child with Father in paternal grandmother's home. On June 9, 2023, the juvenile court filed permanency review orders noting Mother had been minimally compliant with her permanency plan goals while Father had been moderately compliant. Physical custody of Child remained with Father in paternal grandmother's home. On September 8, 2023, the juvenile court noted Child had a litany of medical needs, and, thus, the juvenile court transferred physical custody of Child to medical foster care through Delta Family Services ("Delta"). Mother and Father were given supervised visitation, and the placement goal for Child was return to parents.

Following a permanency review hearing, on December 8, 2023, the juvenile court found Mother had been minimally compliant with her permanency plan goals while Father had been moderately compliant. The juvenile court directed placement of Child remain with Delta; Father and Mother were given supervised visitation. The placement goal for Child was return to parents. On March 5 and April 23, 2024, following hearings, the juvenile court found DHS had made reasonable efforts to finalize Child's permanency plan, directed placement of Child remain with Delta, and directed that Mother and Father submit to random drug screenings.

On July 23 and October 15, 2024, following hearings, the juvenile court found Mother and Father minimally compliant with the permanency plan goals, determined DHS had made reasonable efforts to finalize Child's permanency plan, and directed placement of Child remain with Delta. The placement goal was return to parents.

On November 20, 2024, DHS filed a petition for Child's goal change to adoption; this petition was docketed in the lower court at CP-51-DP-0001164-2022. Therein, DHS asserted Child was adjudicated dependent on February 10, 2023, and legal custody had remained with DHS since that time. Child was living in a pre-adoptive foster home. Additionally, on November 20, 2024, DHS filed petitions for the involuntary termination of Mother's and Father's parental rights to Child; these petitions were docketed in the lower court at CP-51-AP-

0000432-2024. DHS sought termination of parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).

After confirming Mother and Father had received service of the petitions, the juvenile court held an evidentiary hearing on May 30, 2025, at which Mother and Father were represented by separate counsel. Further, after independently confirming on the record that there was no conflict between Child's best and legal interests, the juvenile court held Child's guardian *ad litem*, Joann Braverman, Esquire, could represent Child's legal and best interests. N.T., 5/30/25, at 5-6.

Dr. Lydia Vincent-Gallowshaw, a supervisor at CUA, testified she supervised Child's case for the initial nine months, and, thus, she had various interactions with Mother and Father. *Id.* at 9. Dr. Vincent-Gallowshaw testified that, on Memorial Day of 2025, she was sitting on the steps of her friend's house when she saw Mother pull up in a vehicle with two other individuals. *Id.* Dr. Vincent-Gallowshaw testified Mother approached a person on the street, engaged in a hand-to-hand exchange, and headed back towards the vehicle. *Id.* at 12. As Mother walked by her, Dr. Vincent-Gallowshaw asked Mother how she knew the man, and Mother "avoided [the] question." *Id.* Dr. Vincent-Gallowshaw testified she believes she witnessed Mother purchasing an unknown substance from a known drug dealer. *Id.* at 10-12.

Dr. Vincent-Gallowshaw testified that, during the time she supervised Child's case, Mother was "defensive and aggressive" with caseworkers to the

extent that Dr. Vincent-Gallowshaw needed to intervene. *Id.* at 14. Mother told a caseworker she would "stab her," and referring to the caseworker, Mother told Dr. Vincent-Gallowshaw that if "she caught this bitch out on the street she would whoop her ass." *Id.* Mother advised Dr. Vincent-Gallowshaw that she "doesn't f*ck around about her son," and she stated that the agency better hope that, if they see Mother in the parking lot, she doesn't have a weapon to shoot them. *Id.* Dr. Vincent-Gallowshaw testified she overheard Mother threatening the current caseworker, Lonja Jordan. *Id.* at 15.

On cross-examination, Dr. Vincent-Gallowshaw indicated that, during her involvement in the case, Mother and Father were together "on and off." *Id.* at 17. She confirmed that Father was non-aggressive with DHS staff, and he complied with drug/alcohol treatment "on and off." *Id.* To the best of her knowledge, Father never completed drug and alcohol treatment. *Id.* at 18. Dr. Vincent-Gallowshaw indicated that one of Mother's main objectives was to demonstrate sobriety from a long-standing fentanyl addiction, as well as proper housing. *Id.* at 23. She noted she stopped supervising Child's case in January 2024. *Id.* at 21.

Lonja Jordan, a CUA caseworker, testified that, in January of 2024, she became Child's caseworker. *Id.* at 23-24. She noted that Child came into the system because he was born with PCP in his system. *Id.* at 24. She testified that, by the time she took over as the caseworker, Child was in placement, and she has made every effort to help Mother and Father reunify with Child.

*Id.* at 25. Once or twice a month, she invites Mother and Father to the office for a single case plan meeting with the intent of reviewing their goals. *Id.* Throughout the life of this case, neither Mother nor Father have attended any of the single case plan meetings. *Id.* at 26.

She noted that, when she became the caseworker for Child, Mother's and Father's goals included obtaining employment and suitable housing. *Id.* Mother and Father were to attend housing, financial, and parenting education classes at the Achieving Reunification Center ("ARC"). *Id.* Father was to receive drug and alcohol treatment. *Id.* Mother was to receive drug and alcohol treatment, as well as mental health evaluations. *Id.* at 29. These objectives have been in place throughout Child's placement. *Id.* at 30.

Regarding Mother, Ms. Jordan testified Mother has not complied with the drug and alcohol treatment objective. *Id.* She noted that, when she attempted to discuss addiction problems, Mother became irate and refused to answer any questions related thereto. *Id.* at 31. She noted the juvenile court ordered random drug testing for Mother, and Ms. Jordan tried weekly to get Mother to give a sample. *Id.* Mother has refused and generally replies to her messages about drug testing with a litany of profanities. *Id.* at 32. She noted that, prior to January of 2024, when she became the caseworker, Mother took eight random drug tests in 2023, with the last test on October 19, 2023. *Id.* at 33-34. Each time, she tested positive for marijuana and PCP. *Id.* at 34. Given Mother has not completed any type of drug and alcohol treatment

program, Ms. Jordan has concerns about Mother's drug use. *Id.* at 35. She noted that Mother has arrived at the office for supervised visits only to be sent home because she is visibly under the influence of some substance. *Id.* In this regard, she indicated Mother smells of marijuana, appears fatigued, and refuses to answer any questions about her use of PCP. *Id.* at 36.

Ms. Jordan testified that, as part of her objectives, Mother was to get a mental health assessment; however, Mother has provided no proof that she has done so. *Id.* To date, Mother has not engaged in any kind of mental health services. *Id.* Also, Mother was to obtain employment. *Id.* at 37. Ms. Jordan testified Mother told her that she worked for a flower shop; however, when Ms. Jordan called the flower shop, the manager confirmed Mother is not an employee. *Id.* She noted she called as late as last week, and the flower shop again confirmed that Mother does not work at the flower shop. *Id.* Mother has provided no proof of any source of income. *Id.*

Mother was to obtain housing. *Id.* at 38. Despite Ms. Jordan asking Mother for proof of housing, Mother refused to provide her with any information, including the name of a landlord or valid address. *Id.* On one occasion, Mother told her she lived at 15th and Girard Streets and invited Ms. Jordan to come to the intersection where Mother would be waiting with a knife. *Id.* She noted Mother has spent time at friends' homes, but Mother is never on the lease or in any way considered a resident of these homes. *Id.* at 39-40. When she has visited the friends' homes, she has seen no evidence that

the homes are set up for Child. *Id.* at 41. She testified Mother has not met her objective of securing safe housing for Child. *Id.*

Regarding the housing, financial, and parenting education classes at ARC, Ms. Jordan testified Mother never started any of the classes, and she never provided a reason for her failure to do so. *Id.* at 42. Mother never provided evidence that she completed similar programs from a different provider. *Id.* at 43.

Regarding supervised visitation with Child, Ms. Jordan testified that visits were scheduled weekly for Mother and Father. *Id.* Mother initially attended weekly visits; however, by March of 2025, Mother's attendance was sporadic, so visits were reduced to every other week. *Id.* at 44. She noted Mother provided no explanation for missing visits, and the last time she visited Child was a week or two before the hearing. *Id.* at 45. She noted that, when Mother attended visits, her behavior was appropriate toward Child; however, her behavior was inappropriate toward staff and Father in the presence of Child. *Id.* at 46, 94. Mother blatantly threatened to physically harm staff members. *Id.* at 47.

Ms. Jordan noted there were times that Mother and Father appeared for visits while visibly intoxicated. *Id.* Most recently, Mother and Father appeared for a visit the last week of April of 2025 while visibly intoxicated, and Father appeared for a visit mid-May of 2025 while under the influence of Suboxone. *Id.* at 48-49. Both visits had to be abruptly ended. *Id.* at 48. Ms. Jordan

noted that Father appeared to be incoherent for both of these scheduled visits. *Id.* at 49.

Ms. Jordan indicated that Mother had made no progress toward alleviating the circumstances, which resulted in Child's placement. *Id.* at 50. She noted that Mother does not call to check on Child; but rather, she calls to make threats towards staff members. *Id.* Although she has been invited to attend Child's medical appointments, Mother has not done do so. *Id.* She does not provide Child with cards or gifts. *Id.*

In June of 2024, Child was placed with his current loving pre-adoptive foster home where his medical needs are met. *Id.* at 51. She noted Child has Down's Syndrome and receives intensive services. *Id.* at 52. She testified Child "fits in with his [pre-adoptive foster] family," and he is "very, very bonded" with them. *Id.* at 57. Ms. Jordan testified Child identifies his foster parent as "mom," and he runs to her for comfort and security. *Id.* at 58. She noted that Mother and Child do not share a bond, and she does not believe Mother would continue getting Child the medical help he needs if he was returned to her care. *Id.* at 59. She testified that Child would suffer no harm if Mother's parental rights were terminated, and he is with a safe foster family. *Id.* at 60.

Regarding Father, Ms. Jordan confirmed that Father's goals included obtaining employment and suitable housing. *Id.* Like Mother, Father was to

attend housing, financial, and parenting education classes at ARC. *Id.* Also, Father was to receive drug and alcohol treatment. *Id.*

Ms. Jordan indicated Father completed the housing and financial education classes at ARC in 2025. *Id.* at 52. However, he was dropped from the parenting class for non-attendance in April of 2025. *Id.* Ms. Jordan noted this was Father's fourth attempt at completing the parenting classes. *Id.* When asked why he was unable to attend the parenting classes, Father reported he was "going through something." *Id.* at 64.

Regarding employment, Father advised Ms. Jordan that he receives a SSI check; however, he has never provided proof thereof. *Id.* Father provided Ms. Jordan with an address of where he was living; however, when Ms. Jordan went to visit in May of 2025, Father was not present in the home. *Id.* She noted Father previously lived with paternal grandmother; however, the home was not suitable for Child. *Id.* at 66. Ms. Jordan testified that, at this point, she has no evidence that Father has suitable housing for Child, and throughout Child's placement, Father has been "jumping around" from place to place. *Id.* at 67.

Ms. Johson noted that the juvenile court ordered Father to attend random drug screenings, and although she has consistently attempted to get Father to appear for testing, he has not done so with any regularity. *Id.* at 67-68. She noted Father has not completed an assessment, let alone received

treatment, for his substance abuse problems. ***Id.*** at 69. She noted that the use of drugs and alcohol continue to remain a problem for Father. ***Id.***

She indicated that Father had supervised weekly visits with Child; however, in July of 2024, the visits were reduced to every other week. ***Id.*** at 70. She noted Mother and Father usually attended supervised visits together with Child. ***Id.*** at 71. While Father behaves appropriately toward Child, Ms. Jordan notes she has concerns about domestic violence between Mother and Father. ***Id.*** She noted Father has been asked to leave visits with Child because he is visibly intoxicated. ***Id.*** at 72. She indicated that, when questioned, Father has admitted to being under the influence during visits, including the visits during the last week of April and mid-May of 2025. ***Id.*** She testified Father admitted he was under the influence of Suboxone, but he did not provide her with evidence of a valid prescription for the drug. ***Id.*** at 73.

Ms. Jordan testified that, despite being invited, Father has attended none of Child's medical appointments. ***Id.*** Outside of visits, Father does not inquire about Child, and he has provided neither gifts nor cards for Child. ***Id.*** She testified that Child and Father are not bonded, and Child would not suffer harm if Father's parental rights were terminated. ***Id.*** at 74. On the other hand, she testified Child would suffer harm if he was removed from his pre-adoptive foster family. ***Id.*** She indicated the foster family meets Child's needs. ***Id.*** at 75. She noted paternal grandmother has been explored as a possible kinship resource; however, paternal grandmother, as well as paternal

grandmother's caregiver, have indicated she is not in a position to care for Child. *Id.*

On cross-examination, Ms. Jordan confirmed that Mother and Father were both unsuccessfully discharged from Family School, which involves parenting skills. *Id.* at 77. She confirmed Mother was discharged for overfeeding Child to the point that he vomited, and Father just stopped going. *Id.* She confirmed neither Father nor Mother ever inquire about Child's medical appointments or his medical needs. *Id.* While she has observed a bond between Child and foster mother, she has observed no bond between Child and his biological parents. *Id.* The last time she spoke with paternal grandmother, she reported that Father no longer lives with her. *Id.* at 81.

Ms. Jordan noted that Father's telephone number often changes, and Father currently has no working phone. *Id.* Ms. Jordan indicated Father advised he is living with his cousin; however, she has been unable to get into the house to confirm it is suitable for Child. *Id.* at 87. Regarding Mother's current living situation with her friend, Ms. Jordan noted the home is small, and there is insufficient room for a playpen in the area where Mother sleeps. *Id.* at 99. Child has his own room in his pre-adoptive foster home. *Id.* Ms. Jordan confirmed that she does not believe Mother would intentionally harm Child; however, she may harm Child "out of ignorance." *Id.*

Paternal grandmother testified that CUA caseworkers send her text messages looking for Father; however, she is unable to locate him because

- 16 -

Father does not have a telephone. *Id.* at 103. She confirmed that Father is not living with her, but she would be willing to provide care for Child. *Id.* at 104. She noted she suffers from arthritis and diabetes. *Id.*

Father's cousin testified she helped Father by offering him housing and moral support. *Id.* at 110. She admitted that Father needs to enroll in a drug program, and she told him that she would help him get into a program. *Id.* However, she and Father did not communicate again after that conversation. *Id.* at 111.

Father testified he lives with his cousin in a one-bedroom apartment, but he is looking for his own housing. *Id.* at 115. He testified he receives disability payments due to his ADHD. *Id.* at 116. He testified he has re-enrolled in the ARC parenting class. *Id.* He noted he has experienced difficulties because his telephone is broken. *Id.* at 117. He testified he was unaware that he was supposed to receive a drug and alcohol assessment; however, he admitted that, when he submitted to random testing, he tested positive for benzodiazepine. *Id.* He denied taking any illegal drugs or being in a relationship with Mother. *Id.* He testified he wants physical custody of Child. *Id.*

On cross-examination, Father admitted that he did not attend all of the drug screenings; however, he explained it was because he did not have a working telephone. *Id.* at 120. Father indicated he takes a prescribed drug, Seroquel. *Id.* He did not provide CUA with a copy of the prescription because

he felt he did not need to do so. *Id.* He indicated he suffers from post-traumatic stress disorder, but he has never received mental health treatment. *Id.* He testified he "does not need it." *Id.* at 123.

At the conclusion of the hearing, by decree entered on May 30, 2025, at lower court docket number CP-51-DP-0001164-2022, the juvenile court changed Child's placement goal to adoption and directed DHS to notify the adoption unit within thirty days. Further, by decree entered on May 30, 2025, at lower court docket number CP-51-AP-0000432-2024, the juvenile court terminated Mother's and Father's parental rights to Child pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). Father filed a notice of appeal from solely the termination decree at lower court docket number CP-51-AP-0000432-2024, along with a contemporaneous concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The juvenile court filed a responsive Pa.R.A.P. 1925(a) opinion. Thereafter, on August 18, 2025, Father's counsel, Attorney Cherniack, filed a petition to withdraw her representation, as well as an *Anders* brief.

On appeal, counsel raises the following issues on behalf of Father in the *Anders* brief's "Statement of the Questions Involved" (verbatim):

A. Whether the Philadelphia Department of Human Services failed to prove by clear and convincing evidence that Father's parental rights should not have been terminated pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5) and (8) since he had not been properly informed or offered services by DHS in any order?

B. Whether the [juvenile] court erroneously terminated Father's parental rights where he was not given the opportunity to form

a strong emotional and parental bond between Father and Child and which would not have had a negative effect on Child if permanently severed because CUA failed to offer him visits?

*Anders* Brief at 5.

Our standard of review is well-settled:

In an appeal from an order terminating parental rights, our scope of review is comprehensive: we consider all the evidence presented as well as the [juvenile] court's factual findings and legal conclusions. However, our standard of review is narrow: we will reverse the [juvenile] court's order only if we conclude that the [juvenile] court abused its discretion, made an error of law, or lacked competent evidence to support its findings. The [juvenile court] judge's decision is entitled to the same deference as a jury verdict.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). Further,

we have stated:

Where the [juvenile] court's findings are supported by competent evidence of record, we must affirm the [juvenile] court even though the record could support an opposite result. We are bound by the findings of the [juvenile] court which have adequate support in the record so long as the findings do not evidence capricious disregard for competent and credible evidence. The [juvenile] court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence. Though we are not bound by the [juvenile] court's inferences and deductions, we may reject its conclusions only if they involve errors of law or are clearly unreasonable in light of the [juvenile] court's sustainable findings.

*In re M.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citations omitted).

Before we begin our substantive analysis, we must address the petition

to withdraw as counsel, which was filed by Father's counsel, Attorney

Cherniack. When counsel files an *Anders* brief, this Court may not review the

- 19 -

merits without first addressing counsel's request to withdraw. ***Commonwealth v. Washington***, 63 A.3d 797, 800 (Pa.Super. 2013). We review Attorney Cherniack's ***Anders*** brief for compliance with the requirements set forth by our Supreme Court in ***Santiago***, ***supra***.

> Counsel must:
>
> (1) provide a summary of the procedural history and facts, with citations to the record; (2) refer to anything in the record that counsel believes arguably supports the appeal; (3) set forth counsel's conclusion that the appeal is frivolous; and (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

***Santiago***, ***supra***, 978 A.2d at 361.

Additionally, pursuant to ***Commonwealth v. Millisock***, 873 A.2d 748 (Pa.Super. 2005), and its progeny, "[c]ounsel also must provide a copy of the ***Anders*** brief to [her] client." ***Commonwealth v. Orellana***, 86 A.3d 877, 880 (Pa.Super. 2014). Counsel must attach to the brief a letter that advises the client of his right to: "(1) retain new counsel to pursue the appeal; (2) proceed *pro se* on appeal; or (3) raise any points that the appellant deems worthy of the court's attention in addition to the points raised by counsel in the ***Anders*** brief." ***Id.*** (internal quotation marks and citation omitted). "Once counsel has satisfied the above requirements, it is then this Court's duty to conduct its own review of the [juvenile] court's proceedings and render an independent judgment as to whether the appeal is, in fact, wholly frivolous."

***Commonwealth v. Goodwin***, 928 A.2d 287, 291 (Pa.Super. 2007) (*en banc*) (quotation omitted).

Here, Attorney Cherniack filed a petition to withdraw, and, therein, she confirmed she sent Father a letter informing him of his right to obtain new counsel, or to proceed *pro se*, and explained that Father may raise any additional arguments with this Court. A copy of this letter is attached to the petition to withdraw.[3] ***See*** Petition to Withdraw, 8/18/25.

In her ***Anders*** brief, Attorney Cherniack sets forth the relevant history of the case, as well as her reasons for concluding that Father's appeal is wholly frivolous. Attorney Cherniack indicates in her petition that a copy of this brief was forwarded to Father. ***See*** Petition to Withdraw, filed 8/18/25. Accordingly, we conclude that Attorney Cherniack has complied with the technical requirements of ***Anders***, ***Santiago***, and ***Millisock***. We, therefore, proceed with our independent review of the record and the issues presented on Father's behalf.

The involuntary termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis. The juvenile court must initially determine whether the conduct of the parent warrants termination under Subsection 2511(a). Only if the court determines that the petitioner established grounds for termination under Subsection 2511(a) does

_____

[3] We note Father did not file a brief with privately retained counsel or *pro se*.

- 21 -

it then engage in assessing the petition under Subsection 2511(b), which involves a child's needs and welfare. *In re T.S.M.*, 620 Pa. 602, 71 A.3d 251, 267 (2013). To involuntarily terminate parental rights, the petitioner must prove grounds under both Subsections 2511(a) and (b) by clear and convincing evidence. *Id.*

Instantly, the juvenile court terminated Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). In order to affirm the termination of parental rights, this Court need only agree with the juvenile court's findings under any one enumerated Subsection of 2511(a), as well as 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*).

In this case, we review the decree involuntarily terminating parental rights pursuant to Subsections 2511(a)(8) and (b), which provide as follows:

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> ***
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.
>
> ***
>
> **(b) Other considerations**.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings,

income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(8), (b) (bold in original).

Pursuant to Subsection 2511(a)(8), the petitioner must prove (1) the child has been removed from parental care for 12 months or more; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) the termination of parental rights would best serve the needs and welfare of the child. This Court has explained:

> Unlike other subsections, § 2511(a)(8) does not require the court to evaluate a parent's willingness or ability to remedy the conditions that led to the placement of the child[.] *In re M.A.B.*, 166 A.3d 434, 446 (Pa.Super. 2017). "[T]he relevant inquiry" regarding the second prong of § 2511(a)(8) "is whether the conditions that led to removal have been remedied and thus whether reunification of parent and child is imminent at the time of the hearing." *In re I.J.*, 972 A.2d 5, 11 (Pa.Super. 2009). Further, the Adoption Act prohibits the court from considering, as part of the § 2511(a)(8) analysis, "any efforts by the parent to remedy the conditions described [in the petition] which are first initiated subsequent to the giving of notice of the filing of the petition." 23 Pa.C.S.A. § 2511(b).
>
> Although § 2511(a) generally focuses on the behavior of the parent, the third prong of § 2511(a)(8) specifically "accounts for the needs of the child." *In re C.L.G.*, 956 A.2d 999, 1008-09 (Pa.Super. 2008) (*en banc*). This Court has recognized "that the application of [§ 2511(a)(8)] may seem harsh when the parent has begun to make progress toward resolving the problems that had led to the removal of his or her child[.]" *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa.Super. 2006).
>
> However, by allowing for termination when the conditions that led to removal of a child continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in

abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates only a short period of time…in which to complete the process of either reunification or adoption for a child who has been placed in foster care.

*In re M.E.*, 283 A.3d 820, 832 (Pa.Super. 2022) (citation omitted).

Subsection 2511(b) requires the court to "give primary consideration to the developmental, physical and emotional needs and welfare of the child" when considering whether to involuntarily terminate parental rights. 23 Pa.C.S.A. § 2511(b). Our Supreme Court, in *In re E.M.*, 533 Pa. 115, 620 A.2d 481 (1993), first recognized that the "emotional needs and welfare" analysis under Subsection 2511(b) should include, in part, the child's bond with his or her parent. In doing so, the Court later articulated that the effect on the child of severing a bond with a parent requires "a determination of whether the bond is necessary and beneficial to the child, *i.e.*, whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare." *In the Interest of K.T.*, ___ Pa. ___, 296 A.3d 1085 (2023).

In concluding that DHS proved the grounds for termination, by clear and convincing evidence, under Subsections 2511(a)(8) and (b), the juvenile court relevantly indicated the following:

> [Child]…came to [DHS's] attention because he was born positive for substances. As counsel…laid out, he was not immediately committed. In fact, Father was given temporary legal

custody[.] And after that was when an OPC or a commit was obtained….And so I see it, for pretty much the life of the case, Mother has allowed her drug addiction and not addressing it to create incapacity….She neglected to address one of the biggest incapacities that existed, preventing her from being able to parent [Child]. And the testimony was that Mother was testing positive for all the screens that were done in 2023 for both marijuana and PCP.

\*\*\*

I have no screens since 2023. So, I have no ability to know that Mother has addressed that issue. Not only do I have no screens, but I don't have any testimony that she successfully completed a drug and alcohol program. And so, as I see it, that incapacity—and PCP is a drug that has caused individuals to do horrible things to other people because they're hallucinating. And [Child] is a special needs child[.]

\*\*\*

With respect to Father, [] we are in pretty much the same position with him as we are with Mother, albeit, Father is offering that he is prescribed Suboxone and has been for some time, and that he is prescribed Seroquel for ADHD. Father offered testimony—I don't believe it's inconsistent with the testimony that Ms. Jordan offered, which is that Father was discharged from ARC for parenting….[Father] was ordered for randoms…, Father knew from my orders when he was present in court that he was supposed to be going for random drug screens. And so I do have some recent drug screens, but nothing consistent, no completion of a drug and alcohol program.

\*\*\*

[Child] has been in care about 20—a little less than 24 months….Quite frankly, he was removed from Mother for about 30 months because [Father had temporary physical custody just before Child was placed through Delta]. Father was initially, albeit temporarily, as we were sorting out whether [Child]—the case could be discharged and [Child] safely reside with Father completely. [Child] has been removed from Father's care for about 22, 23 months since he's been in care. So, we are…well past the 12-month timeline that's set forth in 2511(a)(8).

[As stated, Child] was brought to [DHS's] attention because of drugs in his system when he was born with Mother. And [he was] subsequently removed from Father because of concerns that

- 25 -

were litigated and came up as to drug use for Father. In addition to that, issues that came up for them were housing, mental health for Mother, and those were the biggest.

Father did address the housing program, completed that. Father addressed the financial literacy program, completed that. But even as we sit here today, Father does not have the housing to be able to reside with [Child], and he's [been] looking for housing, but that's been an ongoing issue for him for the last three years, well two and a half years. Not two and half, two years, the 22 or 23 months.

For Mother—quite frankly, neither Mother nor Father have been stable in terms of housing for the life of the case. They've moved around a couple of times. As I indicated earlier, both of their whereabouts were unknown for a good part of 2024.

Even as we sit here today, they haven't been visiting consistently. And so I am finding that for both Mother and Father the conditions that led to [Child] being removed from their care, most notably the drug use for Mother and Father, and then as to Mother the mental health concerns that came up based on her interactions with adults around her. And while CUA testified credibly so that Mother never directed any of that negative behavior towards [Child], it was in front of [Child], which is concerning to the Court.

Also,…as to Mother, I am factoring in the testimony from the previous CUA case management supervisor, who by happenstance came across Mother involved [with] an individual she identified as a known drug person in the area. Mother objected to that characterization, but again, [the CUA case supervisor] witnessed what appeared to be a transaction between Mother and that person. And Mother refused to answer when she was asking her about the transaction.

And so [the Court finds] that…there is concern for Mother still being active in her addiction. Especially since she has not done any of the randoms that have been continually court ordered. And even if I don't factor in that interaction with Mother, I am still left with no drug screens since 2023, and the drug screens back in 2023 still being positive for PCP as well as marijuana.

And so…Mother [has been given] plenty of opportunities, all of 2024, to be in a drug and alcohol program, as well as to do

screens so that I could confirm that---she was testing negative, and that has not occurred.

So in looking at the screens that we have for Father, it would appear that all of them were positive for marijuana. When we started testing for fentanyl, which was—began I believe towards the end of 2024. So, the first screen that tested for fentanyl was 8/9/24. All of the screens after that were negative for fentanyl.

However, Father had three screens that were also positive for benzodiazepines. And so Father's testimony is that he has been receiving Seroquel consistently for the past four years, and so I would expect then if Seroquel were not a benzodiazepine—were in fact a benzodiazepine, that all of the screens for the last three years that this case has been involved would all be positive for benzodiazepine as opposed to only three of the—three of the nine.

In addition, the testimony from Father's own witness was that they were seeking help to get Father enrolled in a drug and alcohol program this year. And so [Child] was removed from Father because of drug and alcohol concerns, and those concerns still exist today.

Then the Court would turn its attention to [the best interests of Child under Subsections 2511(a)(8) and (b)]. The testimony from CUA is that Child does recognize both Mother and Father. Their interaction is appropriate, nothing improper. Mother—her interaction with staff in front of [Child] is not proper, but Father doesn't have that same issue, but there's no issue with that, but the bond that may exist with both Mother and Father does not rise to the level of a parent-child bond.

CUA was very specific in that, in observing Mother's and Father's interactions with [Child] versus his interaction with his current foster parent, it is clear that the individual he looks to and sees as a parent figure is his foster parent. And counsel for Mother [or] Father pointed out [Child] has been in care and with his foster parent for almost a year now. And so, of course, the relationship would be closer with the foster parent than with Mother and Father, but that's not the standard that I have to look at.

The standard is whether there would be irreparable harm if I involuntarily terminated Mother's and Father's parental rights. And based on the testimony that I heard from CUA, which again I found credible, and I forgot to say that I did find the supervisor credible, even if not holding to the conclusions that she drew, I don't believe that there would be any detrimental impact to

terminate involuntarily Mother's or Father's parental rights to [Child].

The relationship he has with his foster parent has stabilized him, and he, based on CUA's testimony, is very comfortable in that home. And, in fact, the CUA caseworker testified that if he were removed from that home it might be detrimental to him because he's so settled into the family's home at this time.

***

[Since being placed with Delta, Child has become] up to date with all of his medical appointments and immunizations. [Accordingly, Mother's and Father's parental rights are terminated under Subsections 2511(a)(8) and (b).] Also, having terminated involuntarily Mother's and Father's rights, I will also change the goal to adoption.

N.T., 5/30/25, at 134-36, 138-44.

We find no abuse of discretion. *In re L.M.*, *supra* (setting forth our standard of review). With respect to the first prong of Subsection 2511(a)(8), the record demonstrates Child has been removed from parental care for twelve months or more.

With respect to the second prong of Subsection 2511(a)(8), we agree with the juvenile court that DHS met its burden of proving the conditions which led to the removal or placement of Child continue to exist. *See In re T.S.M.*, *supra* (setting forth the burden of proof in termination cases). Specifically, Child was removed from Father's care due to concerns about his substance abuse and inability to provide stable housing for Child. Thereafter, while Child was temporarily placed with Father, he was then placed with a foster family through Delta because of his special medical needs, which were not being met in Father's care.

Father has failed to demonstrate that he completed alcohol/drug treatment or secured suitable housing for Child. To the extent Father contends services were not offered to him, we note the record is replete with the efforts DHS made and the services offered to Father. Moreover, the juvenile court ordered Father to take random drug tests, and he failed to comply. Thus, DHS met the second prong of Subsection 2511(a)(8).

With respect to the third prong of Subsection 2511(a)(8), we agree with the juvenile court that DHS proved termination of Father's parental rights will best serve the needs and welfare of Child, who has special developmental needs. *See In re T.S.M.*, *supra* (setting forth the burden of proof). Child's mental, physical, and behavioral needs are being met by his placement family. The bond between Child and Father is not a parent-child bond. Contrary to Father's suggestion, he was offered visits to form a bond with Child; however, Father appeared for visits visibly intoxicated, thus requiring the abrupt ending of the visits. The juvenile court determined that Child's need for permanency is paramount in this case, particularly in light of Child's special needs. We discern no abuse of discretion. *In re L.M.*, *supra*.

Having determined the juvenile court properly found DHS met its burden under Subsection 2511(a)(8), we next examine whether termination is in the best interests of Child under Subsection 2511(b). *See In re C.L.G.*, 956 A.2d at 1009 (holding that, after we resolve the analysis of the "needs and welfare of the child" under Subsection 2511(a)(8), we must then address the "needs

and welfare of the child" under Subsection 2511(b)). Bond, permanency, stability, and all other intangibles are "all of 'primary' importance in the Subsection 2511(b) analysis." *In the Interest of K.T.*, *supra*, 296 A.3d at 1109. It is within the province of the juvenile court to "consider the totality of the circumstances when performing a needs and welfare analysis." *Id.* We will not disturb such an assessment if the juvenile court's factual findings are supported by the record. *See id.*

Here, as indicated *supra*, the juvenile court determined any bond between Child and Father is not that of a parent-child bond. The juvenile court found the severance of any bond Child has with Father would be beneficial to Child. *Id.* at 23. Severance thereof would be beneficial so that Child may continue to develop the attachment, which he already has with his pre-adoptive foster family, who are meeting his needs. *Id.* In considering the totality of the circumstances, we discern no abuse of discretion by the juvenile court in terminating Father's parental rights under Subsection 2511(b).[4]

_____

[4] We note Father has raised no specific issues related to the juvenile court's changing of Child's goal from reunification with biological parents to adoption. In any event, it is well-settled that if this Court affirms a termination of parental rights, it renders moot any challenge to the goal change. *See In re Adoption of A.H.*, 247 A.3d 439, 446 (Pa.Super. 2021) ("[T]he effect of our decision to affirm the [juvenile] court's termination decree necessarily renders moot the dependency court's decision to change [c]hild's goal to adoption.") (citation omitted).

Finally, our review of the record does not reveal any non-frivolous issues overlooked by Attorney Cherniack. After our independent review, we conclude that the evidence presented supports the juvenile court's decree involuntarily terminating Father's parental rights pursuant to Subsections 2511(a)(8) and (b). *See In re M.G.*, *supra* (absent abuse of discretion, error of law, or insufficient evidentiary support for the lower court's decision, decree in termination of parental rights proceeding must stand). Thus, we affirm the juvenile court's decree and grant Attorney Cherniack's petition to withdraw her representation.

Decree affirmed. Petition to withdraw granted.

Judge Kunselman joins this decision.

Judge Dubow did not participate in the consideration or decision of this case.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 11/12/2025